880 So.2d 20 (2004)
R.J.
v.
M.J.
No. 2003 CU 2676.
Court of Appeal of Louisiana, First Circuit.
May 14, 2004.
*21 Sylvia Roberts, Baton Rouge, Counsel for Plaintiff/Appellee, R.J.
Scott P. Gaspard, Baton Rouge, Counsel for Defendant/Appellant, M.J.
Before: WHIPPLE, KUHN, and MCDONALD, JJ.
WHIPPLE, J.
In these protracted custody proceedings, the mother, M.J., appeals from a judgment of the trial court naming the father, R.J., as the domiciliary parent of their minor child, B.J. R.J. filed an answer to the appeal, contending that the trial court erred in setting the custody determination for "review" on its own motion.
For the following reasons, we grant the relief requested in the answer to appeal and reverse the judgment in part. In all other aspects, we affirm.

FACTS AND PROCEDURAL HISTORY
The parties in this matter were married on December 21, 1991 in East Baton Rouge Parish. One child, B.J., was born *22 of this marriage on March 9, 1993. The parties were subsequently divorced on July 8, 1998. Thereafter, the parties consented to a stipulated judgment on November 4, 1998, awarding them joint care, custody, and control of the child, with M.J. designated as the domiciliary parent, subject to alternating weekend and holiday visitation in favor of R.J.
On August 8, 2000, R.J. filed a Rule to Show Cause and for Contempt alleging M.J.: (1) denied him court-ordered visitation with B.J.; (2) failed to provide appropriate clothing for the child; (3) failed to communicate with R.J.; and (4) made inappropriate statements in the presence of the child. As a result of that rule, the parties entered into a stipulated judgment on February 22, 2001, which provided for communication and notice between the parties via facsimile and for M.J. to provide the child with proper clothing during custodial periods with R.J.
On May 3, 2002, R.J. filed a "Rule to Show Cause Why Custody Should Not Be Modified and for Other Relief," seeking to be named as the domiciliary parent. In this rule, R.J. alleged at least three incidents had occurred in which M.J. denied him custody of the child during his scheduled visitation periods. As additional support for his request to be named domiciliary parent, R.J. alleged M.J. had violated the terms of the previous stipulated judgment and had failed to give appropriate attention to or denied the significant behavioral problems that the child was exhibiting at school.
As a result of this rule, on August 15, 2002, the parties entered into another stipulated judgment wherein they agreed to share equal custody of B.J. on a "fifty-fifty basis." The judgment also included specific provisions for communication between the parties on all circumstances involving the minor child. The judgment further recited that the trial court would set a trial date as soon as possible for a determination on the following issues: (1) custodial schedule of each of the parties subsequent to December 31, 2002; (2) a modification of the domiciliary parent designation; and (3) child support and any other issues that the parties requested the court to hear and determine.
The matter was eventually set for trial on the merits, and was heard on February 6, 7, and 13, 2003. During the course of the trial, the trial court heard the testimony of numerous factual witnesses, and received numerous exhibits and documentary evidence. The trial court took the matter under advisement and on March 28, 2003, rendered written reasons for judgment. On June 16, 2003, a written judgment in conformity with the court's reasons was signed by the trial court, finding that: (1) R.J. had proven a material change in circumstances since the rendition of the last judgment on November 4, 1998; (2) that "no evidence of parental fitness [had been] taken in connection with the rendering of the judgment rendered November 4, 1998;" and (3) that the child's best interest required that R.J. be designated as the domiciliary parent. The judgment further ordered that the parties maintain joint custody, and provided a visitation schedule for M.J., consisting of alternating weekly custody of B.J. during the summer months. However, the trial court specifically found that it was not in the child's best interest that the parties share physical custody of the minor child on an equal basis during the school year, given B.J.'s "academic and behavioral problems [that] are in need of serious attention," and the court's conclusion "that [R.J.] is the parent who can best address these needs."[1]
*23 M.J. appeals the June 16, 2003 judgment of the trial court, asserting as her sole assignment of error that the trial court manifestly erred in finding that R.J. met the requisite burden of proof for a change in custody. R.J. answered the appeal, contending the trial court erred in setting a date for future review of the court's custody determination to be held at the conclusion of the Fall 2003 school semester.

DISCUSSION
It is a well recognized tenet of Louisiana jurisprudence that an award of child custody is not a tool to regulate human behavior. Cleeton v. Cleeton, 383 So.2d 1231, 1236 (La.1979) (on rehearing). Instead, every child custody case must be reviewed within its own peculiar set of facts. Connelly v. Connelly, 94-0527, p. 4 (La.App. 1st Cir.10/7/94), 644 So.2d 789, 793. The trial judge is in the best position to ascertain the best interest of the child given each unique set of circumstances. Major v. Major, 2002-2131, p. 4 (La.App. 1st Cir.2/14/03), 849 So.2d 547, 550. Accordingly, a trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Thompson v. Thompson, 532 So.2d 101, 101 (La.1988) (per curiam); Bercegeay v. Bercegeay, 96-0516, p. 5 (La.App. 1st Cir.2/14/97), 689 So.2d 674, 676.
In the instant case, as in most custody cases, the trial court's determination was based heavily on factual findings.[2] As an appellate court, we cannot set aside the trial court's factual findings unless we determine that there is no reasonable factual basis for the findings and the findings are clearly wrong (manifestly erroneous). Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Major, 2002-2131 at p. 5, 849 So.2d at 550.
Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Rosell, 549 So.2d at 844.
In her sole assignment of error, M.J. asserts that the trial court erred in finding that R.J. met the requisite burden of proof as to warrant a modification of the prior custody arrangement.
Louisiana Civil Code article 131 provides that in a proceeding for divorce or thereafter, the paramount consideration in any determination of child custody is the consideration of the best interest of the child. The burden of proof on a party seeking to modify a prior permanent custody award is dependent on the nature of the original custody award. Evans v. Lungrin, 97-0541, 97-0577, pp. 12-13 (La.2/6/98), 708 So.2d 731, 738. Custody *24 awards are commonly made in two types of decisions. The first is through a stipulated judgment, such as when the parties consent to a custodial arrangement. The second is through a considered decree, wherein the trial court receives evidence of parental fitness to exercise care, custody, and control of a child. D'Aquilla v. D'Aquilla, 2003-2212, p. 4 (La.App. 1st Cir.4/2/04), 879 So.2d 145, 148, citing Evans, 97-0541 at pp. 12-13, 708 So.2d at 738.
Once a considered decree of permanent custody has been rendered by a court, the proponent of the change bears a heavy burden of proving that a change of circumstances has occurred, such that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, or that harm likely caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
However, in cases such as the instant matter, where the underlying custody decree is a stipulated judgment, and the parties have consented to a custodial arrangement with no evidence as to parental fitness, the heavy burden of proof rule enunciated in Bergeron is inapplicable. Major, 2002-2131 at p. 7, 849 So.2d at 552. Instead, parties seeking modification of a consent decree must show that there has been a material change of circumstances since the original custody decree was entered and that the proposed modification is in the best interest of the child. Major, 2002-2131 at p. 7, 849 So.2d at 552.
In the instant case, the underlying custody decree is a stipulated judgment wherein the parties consented to a custodial arrangement with M.J. designated as the primary domiciliary parent. The stipulated judgment was rendered without evidence as to parental fitness; thus, the heavy burden of proof rule enunciated in Bergeron is inapplicable. Nonetheless, in order to modify the existing custody arrangement, R.J. was required to establish that a change in circumstances materially affecting the welfare of the child had occurred since the rendition of the stipulated judgment on November 4, 1998, and, further, that the modification proposed by him is in the best interest of the child.
Ten witnesses testified at trial: W.J., the adult son of R.J. and half brother of B.J.; Ms. B.J., the mother of R.J. and grandmother of B.J.; Deidra LaPlace, B.J.'s lower school principal; A.J., sister of R.J. and aunt of B.J.; John Allen, current husband of M.J. and step-father of B.J.; Michael Burris, a certified public accountant accepted by the court as an expert witness in accounting; Karvett Queen, a bookkeeper for M.J.'s businesses; Sara Downing, a certified public accountant who prepared tax returns for M.J. and her businesses; and the parties. The trial court also received numerous exhibits pertinent to the custody determination, including B.J.'s school discipline reports, correspondence from the school, report cards, records of a psychological evaluation of the child by Dr. Alicia Pellegrin, a clinical psychologist, and documentation and records in other law suits involving M.J.[3]
Dr. Pellegrin performed a "psychoeducational evaluation" of the child on December 17, 2001. The report stated as the "Presenting Problem" that B.J. was referred by the Dunham School for psychoeducational evaluation to evaluate his *25 school-related behavioral difficulty, including sexual acting-out behaviors. The testing results revealed that B.J. exhibited "adjustment disorder with mixed disturbance of emotions and conduct"; "weakness in written expression"; and "articulation difficulties."
In addition to specific recommendations to improve B.J.'s speech and writing abilities, Dr. Pellegrin recommended, in part: (1) a course of individual psychotherapy for B.J. to develop better coping, social, and stress management skills, as well as to address issues related to his parents' divorce; (2) family therapy for B.J. and his parents (both biological and step) to develop better communication, clarify expectations, and improve the general functioning of the family; (3) that B.J.'s parents (both biological and step) participate in a parent-training program, with focuses on improving structure, consistency, and the appropriate use of rewards and consequences for behavior; and (4) that B.J. submit to a thorough speech and language evaluation to more fully assess B.J.'s articulation difficulties, and if necessary, obtain comprehensive speech and language therapy.[4]
In determining that R.J. met his burden of showing a material change in circumstances since the original custody decree was entered and that the proposed modification is in the best interest of the child, the trial court found that at the time the November 4, 1998 stipulated judgment was entered, B.J. was four years of age and R.J.'s employment required that he travel frequently. The trial court further found, "At the present time, [B.J.] is now in fourth grade, and is experiencing behavioral problems at school, and is on the verge of expulsion. Until just recently, [M.J.] has ignored these problems." The trial court also included the following footnote: "Although not contained in the record of these proceedings, this Court has received information, confirmed by counsel for both parties, that as of March 27, 2003, [B.J.] was, in fact, expelled from The Dunham School." The trial court additionally noted:
There was also significant evidence that [M.J.] has denied [R.J.] his custodial periods on several different occasions, has withheld important information from [R.J.] concerning [B.J.], and has made derogatory and obscene statements about [R.J.] in the presence of [B.J.]. Additionally, [M.J.] has had another child, and is in the process of divorcing the father of this child.
In determining the best interest of the child, the trial court considered the twelve non-exclusive relevant factors set forth in LSA-C.C. art. 134.[5] After reviewing those factors, the trial court stated:

*26 This Court has no doubt that both of the parties equally love [B.J.], and that [B.J.] loves his parents. This Court also believes that both parties have the capacity and disposition to give [B.J.] love and affection. However, based on the evidence at trial, this Court finds that [R.J.] is more inclined and capable of giving [B.J.] spiritual guidance and more inclined and capable of continuing [B.J.'s] education and rearing.
Prior to the separation of the parties, both [R.J.] and [M.J.] contributed to the care and upbringing of [B.J.], with a significant amount of help from [R.J.'s] mother. After the parties separated, [M.J.] provided most of the care (as [R.J.] only had physical custody every other weekend). However, since August 2002, the parties have been sharing physical custody of [B.J.] on an equal basis, with each of them contributing equally to his upbringing.
After the parties were divorced, [M.J.] remarried, had another child, and is now in the process of obtaining a divorce. [M.J.] lives in the former matrimonial domicile in Woodgate subdivision, which is just off of Highland Road, near LSU. [R.J.] has just recently remarried, and is currently living with his new wife. He lives in a home in Santa Maria subdivision, which is also just off of Highland Road, near the I-10 interstate.
While residing primarily with his mother, [B.J.] has experienced significant problems at school, due to his behavior and his use of foul language. There was significant evidence indicating that [M.J.] constantly uses foul and obscene language around the home, in the presence of her children, as well as in simple business transactions. On the other hand, [R.J.] presented as a well-mannered, disciplined and professional person, who is morally fit, and he has demonstrated an ability to instill these traits in his children.
[B.J.'s] school history is marked with significant behavioral problems, which were largely ignored by [M.J.]. When [R.J.] learned of these problems, he suggested that [B.J.] receive professional counseling. [M.J.] ignored this suggestion, on the belief that she had the skills necessary to deal with [B.J.] and the problems. However, the evidence indicated that these problems got worse, resulting in the Dunham School mandating that [B.J.] have professional counseling if he was to continue there as a student. It was only at this point in time (when the Dunham School intervened), that [M.J.] finally sought counseling for [B.J.].
Lastly, there was a significant amount of evidence introduced that indicates [M.J.] is reluctant to foster a relationship between [B.J.] and [R.J.]. Several witnesses testified that [M.J.] refused to allow [R.J.] to take [B.J.] to a family reunion trip to Atlanta, despite the fact that it was his custodial weekend. There was also evidence that she refused to allow [R.J.] to have his custodial weekend because she had other plans for the child. Additionally, [M.J.] has made derogatory statements about [R.J.] in the presence of [B.J.]. [M.J.] has also withheld important academic *27 and medical information about [B.J.] from [R.J.]. Based on this evidence, this Court finds that [M.J.] has failed to demonstrate an ability or commitment to facilitate a close and continuing relationship between [B.J.] and [R.J.]. [M.J.], as [B.J.'s] mother, must learn that she needs to facilitate a close and continuing relationship between [B.J.] and [R.J.], regardless of her own personal feelings about [R.J.].
The trial court concluded by finding that "it is not feasible nor is it in [B.J.'s] best interest that the parties share physical custody of [B.J.] on an equal basis for the remainder of this school year (Spring 2003), and the Fall 2003 school semester." However, the court found it "feasible and in [B.J.'s] best interest that the parties share physical custody of [B.J.] on an equal basis during the summer."
After a thorough review of all of the testimony and evidence presented herein, we find no error in the trial court's conclusion that R.J. should be designated as the primary domiciliary parent. We note that the primary factor giving rise to the rule filed by R.J. was his legitimate and justified concern about B.J.'s documented behavioral and academic problems at school, leading to his impending expulsion from the Dunham School. The record overwhelmingly demonstrates that B.J.'s escalating behavior of "acting out" sexually and using inappropriate and vulgar language necessitated immediate attention and redirection. The record further establishes that given the testimony and evidence of M.J.'s use of foul language, inadequate level of supervision of B.J. at home, and personal bathing and sleeping habits involving her children, the trial court correctly determined that M.J. was unable to properly address these issues and that the best interest of the child required that R.J. should be designated as B.J.'s domiciliary parent.
Mrs. Deidra LaPlace, B.J.'s school principal, testified as to numerous incidents of inappropriate sexual behavior and misconduct by the child in and outside of the classroom. The testimony of Mrs. LaPlace and R.J. demonstrates that R.J. was more aggressive in attempting to secure much-needed counseling and therapy for B.J.; he requested that B.J. receive tutoring to improve his academic grades; and he practiced consistent methods of discipline with B.J. In contrast, M.J. minimized or denied the seriousness of his documented problems and instead allowed B.J.'s academic and behavioral problems to "slide" to the point where the child faced eventual expulsion from school.
John Allen testified that M.J.'s response to the evaluation or suggestion that B.J. receive therapy was that "all therapists have problems or issues." In addition to testimony by R.J. that M.J. used foul language on a regular basis and the evidence of profanity used by M.J. on written business correspondence with Jenkins Tile Company, Inc., the evidence shows that on several occasions, Mr. Allen likewise witnessed M.J. using foul language when speaking with B.J. and in speaking with him in B.J.'s presence. He also recounted various incidents in which B.J. engaged in sexually suggestive or inappropriate behavior, and which M.J. minimized or failed to address. Contrary to M.J.'s claim at trial that she had taken appropriate disciplinary action, he stated he was not aware of any consistent behavior modification program that M.J. was utilizing with B.J. to properly deal with the child's behavior.
In deciding the custody issues, the trial court further noted M.J.'s unwillingness to foster a loving relationship with B.J. and his father, including her actions in making disparaging remarks against R.J. in the *28 presence of B.J. In addition to the testimony of R.J., these incidents were also described by Mr. Allen, who testified that he witnessed a number of occasions wherein M.J. referred to R.J. as "evil" and said in the child's presence that R.J. stole money from her. The record also reveals several incidents in which M.J. improperly denied R.J.'s court-awarded visitation with B.J. at her whim.
A thorough review of the testimony presented herein and the record as a whole convinces us that the trial court correctly determined that it is in the best interest of B.J. that R.J. be designated as the domiciliary parent. Moreover, the record is replete with testimony that since the parties entered into the November 4, 1998 custody agreement when B.J. was four years of age, significant material changes in the lives and homes of both R.J. and M.J., as well as significant material changes in B.J.'s behavior had occurred, justifying the designation of R.J. as domiciliary parent.
Despite the testimony outlining B.J.'s behavioral problems and comments at school, and the evidence supporting the trial court's ruling, M.J. argues on appeal that the trial court "committed prejudicial, legal error by placing emphasis on R.J.'s remarriage while simultaneously implying that M.J.'s impending divorce reflects badly on her as a parent." After a thorough review of the transcript of the trial and the written reasons for judgment, we find that the trial court's statements that "[M.J.] remarried, had another child, and is now in the process of obtaining a divorce" and that "[R.J.] has just recently remarried, and is currently living with his new wife" were recitations of the parties' marital status as it existed at the time of the trial. Clearly, the trial court considered all of the evidence presented in this custody dispute, including the permanence, as a family unit, of both the existing and proposed custodial home, as well as all other pertinent factors, without placing any undue or negative emphasis on this particular fact. Moreover, the trial court is specifically mandated to consider the stability and permanence of the parties' homes as a factor in determining the best interest of the child. See LSA-C.C. art. 134(5).
Given the extensive testimony concerning the acrimonious relationship of the parties herein, the desperate need for immediate attention to this child's behavioral and academic problems, and M.J.'s inability to properly address these needs, we find the record amply supports the trial court's determination that a material change in circumstances had occurred and that B.J.'s best interest would be served by designating R.J. as the primary domiciliary parent. Thus, we find no error in the trial court's determination that the proposed modification was in the best interest of the minor child.
This assignment lacks merit.

ANSWER TO APPEAL
R.J. filed an Answer to Appeal, contending that the portion of the trial court's judgment limiting its considered custody decree to "the remainder of the school year (Spring 2003) and for the Fall 2003 school semester" and ordering that "[a]t the conclusion of the Fall 2003 school semester, this matter shall be placed back on this Court's docket for a review" constitute violation of this state's custody laws. Specifically, R.J. contends that this court-ordered review is in direct contravention of the mandates of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), which require that the party seeking a change in a custody determination meet a heavy burden standard in order to modify a standing considered decree of custody as rendered herein.
*29 Mindful of the mandates in Bergeron as set forth above, we are unaware of (nor have the parties cited) any authority that allows or provides for a trial court to order such "a review date" in a child custody determination ex proprio motu and in the absence of the filing of a petition for a change of custody by one of the parties. Indeed, the purpose of the heavy burden rule set forth in Bergeron is to avoid extensive and repetitive litigation that could be harmful to the child, to avoid unnecessary changes in the child's life, and to avoid unnecessary litigation. White v. Fetzer, 97-1266, p. 5 (La.App. 3rd Cir.3/6/98), 707 So.2d 1377, 1380, writ denied, 98-0931 (La.5/15/98), 719 So.2d 466.
We find the portion of the trial court's judgment setting its custody determination and resulting judgment for a "review" ex proprio motu several months after a full trial involving the testimony of ten witnesses over the course of a three-day trial and subsequent rendition of a considered decree to be in direct contravention of the heavy burden rule set forth in Bergeron and contrary to the best interest of the child. Absent any statutory or jurisprudential authority for such a procedure, we must conclude the trial court erred in doing so.
Finding merit to the claims set forth in R.J.'s Answer to Appeal, we reverse the portion of the June 16, 2003 judgment wherein the trial court, on its own motion, set this matter for "review" on its docket at the conclusion of the Fall 2003 school semester.[6]

CONCLUSION
For the above reasons, the June 16, 2003 judgment of the trial court maintaining joint custody of the minor child between the parties and designating R.J. as the domiciliary parent of B.J. is affirmed, except with respect to the provision setting the matter for further review.
The Answer to Appeal filed by R.J. is hereby granted and the portion of the June 16, 2003 judgment setting the trial court's custody determination for "review" on the trial court's own motion is reversed.
All costs associated are assessed against appellant, M.J.
AFFIRMED IN PART AND REVERSED IN PART; ANSWER TO APPEAL GRANTED.
NOTES
[1] While this judgment and previous judgments also addressed child support, the support issues are not before us for review in this appeal.
[2] As a procedural fact, we note that the trial of this matter lasted three days and that the record includes multiple volumes and contains in excess of five hundred pages of testimony alone.
[3] Copies of correspondence between M.J. and Jenkins Tile Company, Inc. and a petition filed against M.J. by Jenkins Tile Company, Inc. were introduced along with pleadings filed in connection with M.J.'s impending divorce from John Allen.
[4] Notably, in response, M.J. minimized these findings and testified that Dr. Pellegrin was "incorrect" in that B.J. did not have a speech impediment and never has had one.
[5] The relevant factors in determining the best interest of the child as set forth in LSA-C.C. art. 134 are:

(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
[6] While we realize that this issue may now be moot, given the specified date of the "review" hearing, and the delays for docketing and decision of this appeal, we nonetheless note the legal error by the trial court herein insofar as the trial court may order such future "reviews."